**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| O.P.A.M., <br><br> Petitioner, <br><br> v. <br><br> MINGA WOFFORD, ET AL.,[1] <br><br> Respondents. | Case No. 1:25-cv-01423 JLT SAB <br><br> ORDER CONVERTING THE MATTER TO A PRELIMINARY INJUNCTION AND GRANTING THE PRELIMINARY INJUNCTION[2] <br><br> (Doc. 2) |

## I.   INTRODUCTION

Before the Court for decision is O.P.A.M.'s request for a temporary restraining order ("TRO") (Doc. 2) filed in conjunction with his petition for writ of habeas corpus brought under 28 U.S.C. § 2241 challenging his ongoing immigration detention (Doc. 1). Having evaluated the TRO request, Respondents' opposition (Doc. 11), and O.P.A.M.'s reply (Doc. 12), the Court converts the matter into a motion for preliminary injunction ("PI") and **GRANTS** that motion.

///

---

[1] Respondents appear to suggest that Petitioner has not sued Mesa Verde's warden. (Doc. 11 at 6.) Clearly, Petitioner has attempted to do so. If Respondent is suggesting that the Warden has changed, the Court has been unable to identify the new Warden's name. Regardless, the Court would not lack personal jurisdiction over the Warden of the facility because Fed. R. Civ. P. 25(d) would permit the Court to substitute that official's name in for the named Warden. *See, e.g.*, *Krumback v. Wasko*, No. 4:24-CV-04156-KES, 2025 WL 2430736, at *3 (D.S.D. Aug. 22, 2025). Respondent also object to Petitioner naming multiple officials as Respondents in this matter. In the interest of expedience, the Court will defer determinations of these questions to the merits phase.

[2] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for preliminary injunction. (Doc. 11 at 1, n.1.; Doc. 12 at 20.) The parties have also affirmatively declined an evidentiary hearing. (*Id.*).

## II. FACTUAL & PROCEDURAL BACKGROUND

O.P.A.M., a citizen and national of Ecuador, claims to have fled his home country after facing threats and violence from a criminal organization. (Doc. 1, ¶ 50.) He crossed the border into the United States in March 2024, at which time he was apprehended by the Department of Homeland Security (DHS) near Lukeville, Arizona. (Doc. 1-2, ¶ 10; Doc. 11-1, ¶ 7.) At that time, he expressed a fear to return to his home country. (Doc. 11-2.) According to the declaration of Deportation Officer Martinez, O.P.A.M. admitted to entering the United States unlawfully. (Doc. 11-1, ¶ 7.) On March 11 or 12, 2024, DHS released O.P.A.M. on his own recognizance "due to a lack of detention space" to await his immigration court hearing. (Doc. 1-2, ¶ 12; Doc. 11-1, ¶ 8.) In doing so, immigration officials necessarily determined that O.P.A.M. did not present a risk of flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.").

According to information relayed to the Court from O.P.A.M. through counsel, after his release from DHS custody in March 2024, O.P.A.M. came to live in New York. (Doc. 1-2, ¶ 13.) He established a life in Albion, New York, where he lived with a long-term partner, maintained gainful employment, paid taxes, kept a clean criminal record, participated in his church community, and complied with all requirements to appear in immigration court. (Doc. 1-2, ¶¶ 41- 43.) O.P.A.M. was the primary source of household income and supported his partner and their household needs. (*Id.* at ¶ 41.) O.P.A.M.'s partner submitted a letter describing their relationship and the emotional and financial strain O.P.A.M.'s detention has caused them. (Doc. 1-4 at 2.) ("Since his detention, my life has become very difficult, both emotionally and financially.") O.P.A.M.'s employer and relatives praised his work ethic, character, and devotion to his family, faith, and community. (*Id.* at 4, 6, 9.)

O.P.A.M. also timely filed for asylum and withholding of removal under the Convention Against Torture prior to his initial Master Hearing before the Immigration Court on February 27,

2025. (Doc. 1-2, ¶¶ 19-20.) Prior to his detention, his next scheduled hearing on his asylum application was scheduled for December 10, 2025. (*Id*. at 20-21.)

On August 7, 2025, O.P.A.M. was apprehended by ICE agents on his way to work. (Doc. 1-2, ¶ 25.) The government asserts that according to 8 U.S.C. § 1225(b)(2)(A), O.P.A.M. is subject to mandatory detention. (Doc. 11-1, ¶ 18.) After being placed in DHS custody, O.P.A.M. was transported first to an ICE office and then to the Batavia Processing Center in Buffalo, New York on August 7, 2025 (Doc. 1-2, ¶ 29); then, on September 10, 2025, to a detention center in Louisiana (*Id*., ¶ 12); and finally, on or around September 13, 2025, to the Mesa Verde Processing Center in Bakersfield, California (*Id*., ¶ 35.)

On October 25, 2025, O.P.A.M. filed both a petition for writ of habeas corpus (Doc. 1) asserting that his detention violates his procedural and substantive due process rights under the Fifth Amendment, as well as a motion for temporary restraining order requesting immediate release and other injunctive relief. (Doc. 2.) On October 27, 2025, this Court entered a minute order setting a briefing and hearing schedule. (Doc. 6.) In addition, this Court ordered Respondents not to remove O.P.A.M. from the United States nor transfer O.P.A.M. out of the Eastern District of California unless and until this Court orders otherwise. (*Id*.)

Respondents and O.P.A.M. timely field their respective opposition (Doc. 11) and reply (Doc. 12) briefs. The government opposed the issuance of preliminary injunctive relief and maintains that O.P.A.M.'s detention is "mandatory" under expedited removal procedures set forth at 8 U.S.C. § 1225(b)(2). (*See generally* Doc. 11).

For the reasons set forth below, the Court converts the matter to a motion for preliminary injunction and **GRANTS** the motion.

### III.   LEGAL BACKGROUND

**A.   Statutory Immigration Framework (8 U.S.C. § 1225 and § 1226)**

Two statutes govern the detention and removal of inadmissible noncitizens from the United States: 8 U.S.C. § 1226 and § 1225. In the interest of expedience, the Court relies here, as relevant, on the legal background accurately presented by the district court in *Salcedo Aceros v. Kaiser*, No. 25-CV-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025):

### A. Full Removal Proceedings and Discretionary Detention (§ 1226)

The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and detained" and that the government "may release the alien on ... conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

### B. Expedited Removal and Mandatory Detention (§ 1225)

While "§ 1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

"If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,'" that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are

inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

### C. The Government's Recent Change in Position

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter

> apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)) . . .
>
> In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute.*" Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ... whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025).
>
> Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4 (internal footnotes omitted).

**B.     Parole Revocation**

In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025), the court explained the parole process in immigration cases and noted that before parole may be revoked, the parolee must be given written notice of the impending revocation, which must include a cogent description of the reasons supporting the revocation decision. The court held:

> Section 1182 . . . has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:
>
>> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the

7

> alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.**

8 U.S.C. § 1182(d)(5)(A).

*Y-Z-H-L v Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under the Administrative Procedure Act, immigration parolees are entitled to determinations related to their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the agency fails to "articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. Parole revocations in the context of the INA must occur on a case-by-case basis and may occur "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id*. at *12 (quoting 8 C.F.R. § 212.5(e)). 8 C.F.R. § 212.5(e) requires written notice of the termination of parole except where the immigrant has departed or when the specified period of parole has expired.

Applying *Y-Z-H-L* and § 212.5(e), *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), found that the INA requires a case-by-case analysis as to the decision to revoke humanitarian parole:

> This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual [noncitizen] received parole." *See id*. There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination specific to Mata Velasquez that either "the purpose for which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." *See* 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the court reached a similar conclusion relying on the Due Process Clause:

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

## IV.   ANALYSIS

**A.   Jurisdiction**

    1.   Habeas Corpus

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

O.P.A.M seeks his immediate release from custody, which he contends violates the Constitution of the United States. (*See* Doc. 1.) Thus, he properly invokes the Court's habeas jurisdiction.

### 2. Judicial Review under the INA

The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," there is no removal order at issue here and the central issue is O.P.A.M.'s continued detention. Thus, Court has the authority to review the termination of O.P.A.M.'s release. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 482 (1999).

## B.     Preliminary Injunction

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*, at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits … so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended to "merely to preserve the relative positions of the parties until a trial on the merits can be held, and

to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

The status quo refers to "the last uncontested status which preceded the pending controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)). In the Court's view, that is the status before O.P.A.M. was arrested. *See Kuzmenko v. Phillips,* No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining order requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo).

Even if the Court's action here constitutes a mandatory injunction,[3] the evidence supports that action. O.P.A.M. alleges he has suffered and is suffering violations of his substantive and procedural due process rights and that his continued unlawful detention will impose on him serious injury if the injunction is not issued. The injunction issued here is on firm legal footing and the result does not appear to be doubtful either; due process clearly requires that O.P.A.M. be given a hearing before his bond is revoked. These injuries are not capable of redress through monetary compensation. Accordingly, injunctive relief is appropriate even under the higher standard for mandatory injunctions.[4]

---

[3] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

[4] The government questions whether the Court can order preliminary relief of the nature requested here because the relief sought is akin to the relief requested in the underlying § 2241 petition. (Doc. 11 at 6–7.) The government cites *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992), which indeed held that entering "judgment on the merits in the guise of preliminary relief is a highly inappropriate result." But the circumstances of that case were quite different. In *Mosbacher*, the trial court ordered as preliminary relief the release of data that the defendant sought to keep private and thus, had the Ninth Circuit not reversed, the defendant would "have lost the whole case for all practical purposes." *Id*. Some district courts have relied on this line of cases to deny immigration detainee's requests for release at the TRO stage. *See, e.g., Mendez v. U.S. Immigr. & Customs Enf't*, No. 23-CV-00829-TLT, 2023 WL 2604585, at *3 (N.D. Cal. Mar. 15, 2023) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Keo v. Warden of Mesa Verde Ice Processing Center*, No. 1:24-cv-00919-HBK, 2024 WL 3970514 (E.D. Cal. Aug. 28, 2024) (citing *Mendez*, *Mosbacher*, and *Comenisch*). But a closer look at *Camenisch* reveals that the Supreme Court did not intend to bar TROs of the kind requested here. Rather, *Camenisch* stands for the proposition that "findings of

1.  <u>Likelihood of Success on the Merits</u>

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). O.P.A.M. contends that his re-detention and continued detainment violates due both substantive and procedural due process. (*See generally* Doc. 2, ¶¶ 16–35.)

   a.  *Respondents Rely on an Incorrect Interpretation of § 1225 for the Authority to Detain Respondent*

Respondents maintain O.P.A.M.'s detention is "mandatory" under 1225(b) while his removal proceedings are pending. (Doc. 11 at 5-7.) The various legal arguments relied upon by DHS to support this assertion have been rejected by this Court in other proceedings. *See, e.g.*, *Ortiz Donis v. Chestnut,* 1:25-CV-01228-JLT, 2025 WL 2879514 at *3–6 (E.D. Cal. Oct. 9, 2025). The government's recent interpretation of the relationship between § 1225 and § 1226 is unfounded and detention is therefore not "mandatory" in this case,[5] where petitioner has been present in the United States for approximately nineteen months and was released on his own recognizance well before Respondents adopted the new interpretation of the governing statutes.

   b.  *Due Process Protections*

O.P.A.M. contends that his continued detention violates his due process rights. (*See* Doc. 1, ¶¶ 25–34.) In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to

---

fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not bind the court at the trial on the merits. Thus, it is not appropriate to enter a final judgment at a TRO stage." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1167 (W.D. Wash. 2025) (evaluating government argument based on *Comenisch*).

[5] Respondents argue that "Petitioner's detention is under 1225(b), not § 1226(b)" and "1226(b) cannot apply because Petitioner never legally entered the United States. And § 1225(b) detention does not permit—let alone compel— release based on a lack of dangerousness or flight risk." (Doc. 11 at 10.) This argument is discussed in greater detail below.

> re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").[6] Even assuming Respondents are correct that § 1225(b) is the applicable detention authority for all "applicants for admission," Respondents fail to contend with the liberty interest created by the fact that the Petitioner in this case was released on recognizance in 2024, *prior to the*

---

[6] Respondents rely on cases about the due process rights of aliens in different contexts. For example, they argue:

> An alien who has not effected a legal entry, i.e., has not been admitted into the United States, is entitled only to "[w]hatever the procedure authorized by Congress is." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)); *see also Thuraissigiam*, 591 U.S. at 140 (an alien detained after unlawful entry "has only those rights regarding admission that Congress has provided by statute"); *Angov v. Lynch*, 788 F.3d 893, 898 (9th Cir. 2015) (for "those . . . who have never technically 'entered' the United States . . . procedural due process is simply whatever the procedure authorized by Congress happens to be" (cleaned up)). This makes sense, since "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Barrera-Echavarria*, 44 F.3d at 1449. Put tersely, "applicants for admission have virtually no constitutional rights regarding their applications." *Valencia v. Mukasey*, 548 F.3d 1261, 1263 (9th Cir. 2008) (citing *Landon v. Plasencia*, 459 U.S. 21, 33-34 (1982)). "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy*, 338 U.S. at 544.

(Doc. 11 at 7.) However, as one thorough decision recently issued in the District of Arizona explained, *Thuraissigiam* is distinguishable:

> In *Thuraissigiam* the Supreme Court held that a petitioner who was stopped at the border did not have any due process rights regarding admission into the United States. *Thuraissigiam*, 591 U.S. at 107. In contrast, the pending § 2241 petition does not challenge any determination regarding [petitioner's] admissibility into the United States, but instead involves a challenge to her detention pending the conclusion of her removal proceedings.

*Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *15 (D. Ariz. Aug. 11, 2025), *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025).

*manifestation of this interpretation*.

Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been applied to O.P.A.M. are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL 2084921at *3.[7] In *Mathews*, the Court determined the following:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

As to private interest, during his approximately 19 months on parole, O.P.A.M. pursued gainful employment, built a relationship with his partner and many others in his community, and kept a clean criminal record. Thus, parole allowed him to build a life outside detention, albeit under the terms of that parole. O.P.A.M. has a substantial private interest in being out of custody and his detention denies him that liberty interest. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

The Supreme Court has held that "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). However, the Court also recognized that there may be situations that urgently require arrest, in which a prompt post-deprivation hearing is appropriate. *Id.* at 128 (noting there may be "special case[s]" where a pre-deprivation hearing is impracticable); *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *9 (N.D. Cal. July 17, 2025) ("absent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due

---

[7] Respondent argues (Doc. 11 at 11) that the Court should not apply *Mathews,* citing the Ninth Circuit's ruling in *Rodriguez Diaz*, 53 F.4th 1206, which noted that the Supreme Court, "when confronted with constitutional challenges to immigration detention has not resolved the, through express application of Mathews." Yet, after noting that other circuits have applied the *Mathews* test to immigration detention issues and the Ninth Circuit has applied *Mathews* in other immigration contexts, *Rodriguez Diaz* went on to "assume without deciding" that *Mathews* applied in the immigration context. *Id.* at 1207.

process, particularly where an individual has been released on bond by an IJ"). The rapidly developing caselaw on this subject gives limited guidance as to where this line should be drawn.

Finally, as other courts have done, the Court concludes that the government's interest in detaining O.P.A.M. without proper process is slight, given that there has been no change in any of his circumstances that would warrant a finding that he is a flight risk or a danger to the community. In sum, the Court concludes that he has demonstrated a likelihood of success on the merits on his procedural due process claim.

### C. Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm). The Petitioner has established irreparable harm.

### D. Balance of the Harms/Public Interest

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert

> that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).
>
> This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, as mentioned, there appears to be no dispute that there is no evidence that O.P.A.M. poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the equities and public interest weigh minimally in favor of O.P.A.M.

### E. Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

### F. Burden of Proof

O.P.A.M. requests that if the Court orders a bond hearing, the government should bear the burden of proof. (*See* Doc. 12 at 19.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir.

16

2022), the Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a second bond hearing where the government would have the burden to establish by clear and convincing evidence that his continued detention was justified. *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

> Nothing in this record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden shifting would be constitutionally necessary in all, most, or many cases. There is no reason to believe that, as a general proposition, the government will invariably have more evidence than the alien on most issues bearing on alleged lack of future dangerousness or flight risk.

*Id*. at 1212. However, *Rodriguez Diaz* "held only that a noncitizen detained under section 1226(a) does not have a right to a second bond hearing when the only changed material condition since their first bond hearing is the duration of their detention." *Pinchi*, 2025 WL 2084921, at *4. It did not address the burden of proof applicable under the present circumstances.

*Pinchi* went on to discuss why the calculus changes for an individual who had been paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing provided under section 1226(a) provides constitutionally sufficient process for those noncitizens who have never previously been detained and released by DHS, [Petitioner's] circumstance is different. Her release from ICE custody after her initial apprehension reflected a determination by the government that she was neither a flight risk nor a danger to the community, and [she] has a strong interest in remaining at liberty unless she no longer meets those criteria. The regulations authorizing ICE to release a noncitizen from custody require that the noncitizen "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons" and that the noncitizen is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
>
> Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). [Petitioner] was apprehended by ICE officers when she crossed the border into the United States [ ]. ICE then released her on her own recognizance. As ICE was not authorized to release [her] if she was a danger to the community or a flight risk, the Court must infer from [her] release that ICE determined she was neither. [Her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she

> remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4.

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical even for a post-detention custody hearing for the reasons articulated in *Pinchi*–namely that the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.

## V.     CONCLUSION AND ORDER

1.     Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED.**

2.     Because the government has no evidence that O.P.A.M. poses a risk of flight or poses a danger to the community, O.P.A.M **SHALL** be released **IMMEDIATELY** from DHS custody. DHS **SHALL NOT** impose any additional restrictions on him, such as electronic monitoring, unless that is determined to be necessary at a later custody hearing.

3.     Respondents are **PERMANENTLY ENJOINED AND RESTRAINED** from rearresting or re-detaining O.P.A.M. absent compliance with constitutional protections, which include, at a minimum, pre-deprivation notice[8] of at least seven days before a pre-deprivation hearing at which the government will bear the burden of demonstrating by clear and convincing

---

[8] If legally sufficient circumstances justify arrest without notice in advance, a post-deprivation hearing consistent with the requirements set forth here, **SHALL** be provided within seven days of the arrest.

evidence that he is likely to flee or pose a danger to the community if not arrested.

4. Petitioner may file a further brief on the merits within 21 days. Respondents may file further briefing within 21 days thereafter.

IT IS SO ORDERED.

Dated: __November 7, 2025__

UNITED STATES DISTRICT JUDGE